HARTFORD COUNTY GRIEVANCE COMMITTEE *v.*
MORTON E. COLE ET AL.

SUPERIOR COURT          HARTFORD COUNTY          FILE No. 120561a

Memorandum filed March 22, 1960

*John S. Murtha,* of Hartford, for the Grievance Committee.

*Cyril Cole,* of Hartford, for the respondents.

SHAPIRO, J.   On January 11, 1960, the Hartford County grievance committee conducted a hearing, the purpose of which was "to inquire into the matter of Season's Greeting cards mailed by the firm of Cole and Cole, to determine whether or not impropriety exists." The two members of this firm are Morton E. Cole and Cyril Cole. With them, then and now, are associated six other lawyers. At that

hearing the Messrs. Cole appeared, and both actively participated. The committee, having thus inquired into the matter, and acting in its discretion, recommended that both men be reprimanded by a judge of the Superior Court in open court. On March 15, 1960, they were presented before this court on a charge that they had violated canon 27 of the canons of professional ethics. All of the foregoing was done pursuant to § 51-90 of the General Statutes.

Essentially, the same basic facts were related at both hearings. For the Christmas of 1959 and the coming new year, Cole and Cole mailed out 9250 greeting cards. In size, they were five and a half inches by four and three-eights inches. A red border was imprinted near the edges of the white card, and in the upper left-hand corner was a small design showing three candles and several evergreen boughs. An inside portion of the card, measuring four and a quarter by three and one-eighth inches, had embossed edges, within which appeared printed matter. In the upper portion of this area appeared two printed lines in green ink saying "We Wish You the Season's Greetings and a Happy New Year." The capital letters were nearly three-sixteenths of an inch high, and the smaller letters about one-sixteenth of an inch high. In over-all height, the two lines of this green lettering measured about one-half inch. Below this, in black type, more prominent and eye catching, appeared a number of lines of print. The first line, in the middle of the card, was as follows: "COLE and COLE." All four letters of the name were capital letters, each being nearly three-sixteenths of an inch high. Below this appeared the words "Attorneys at Law." There the "A" and "L" were in the same size type as the name "COLE," and the remaining smaller letters were about one-sixteenth of an inch. Below that, to the left, appeared four names, one above the other, the top

name, in slightly larger type than the others, being "Cyril Cole" and those below being three of the six lawyers associated with the firm. To the right of this list of names appeared four others in similar type and arrangement, the top one being "Morton E. Cole" and those below being the other three of the six lawyers. Below all this was the address "111 Pearl Street, Hartford, Conn." The court has attempted to reproduce this card by description, since an actual reproduction of it in this memorandum would not be possible.

It was disclosed that the 9250 cards were placed in envelopes and addressed by a mailing service and by girls in the Cole and Cole office. The card in question, exhibit A, was addressed to "Joe's Amoco Service, 141 Park Rd., West Hartford, Conn." The names and addresses for the 9250 cards came from a card filing system kept and maintained by Cole and Cole. The cards were of varying colors, each having significance. The compilation and accumulation of these cards began many years ago, having been started by Morton Cole over thirty years ago and continued by the Cole firm after Cyril Cole joined his brother. Some examples of how names were acquired and placed on these cards follow. If a person came into their office for a consultation, his or her name and address would be placed on a card and put in the file even if that matter was not handled by Cole and Cole or that person had no desire to be represented by them; other cards, similarly made out in relation to litigation matters, were called "the pending addresses"; other cards were filled in with names of people described as "friends, social contacts and anyone else I make contact with and yet not their lawyer"; cards were made up with names and addresses of representatives of different claim departments, various doctors and funeral homes with whom contact was had; other cards were made

up with names of tradesmen who entered the office, even though not clients; cards were made up with names of various witnesses connected with Cole and Cole cases; other cards contained names of former jurors who might in some manner have had legal dealings with Cole and Cole, were known as friends or had some business contact with them; if any lawyer in the Cole office stopped at a station for gasoline and thus "met the man there," his name would go on a card. To all of these people, whose names and addresses had been accumulated over the years of the Cole and Cole practice, the Coles sent out the greeting cards in question. They admitted to sending no personal greeting cards, except in the case of Morton Cole, who stated that he might send a personal card to a girl friend of his. As to how the card, exhibit A, came to be sent to Joe's Amoco Service, they explained that this name was added to their mailing list as a result of "someone from the office" having stopped there for gasoline.

The Messrs. Cole stated that in sending out these 9250 cards they acted in "just the spirit of the season." Cyril Cole, in his argument to the court, asked why they "cannot send the season's greetings and wish somebody a Happy New Year in writing at the time of the year when all of us feel most kindly towards our fellow man." As a further analogy, Cyril Cole advanced this argument: He stated that each morning he greets one of the courthouse attendants who is no client of his; that he "never met him professionally"; that during "Christmas week I wish him a Merry Christmas and a Happy New Year. I believe I have a right as a lawyer to put that in writing and send him a card. . . . What a fine state of affairs if next year on Christmas week he says to me 'Merry Christmas, Mr. Cole,' and I say to him, 'I'm sorry I can't wish you the same. I'm a lawyer.'" This situation is claimed by Cyril Cole

to be no different from sending out these 9250 cards in the manner described. His further inquiry is, "Can't I send Christmas cards with the feeling that I have all good wishes to that man?" The cards to which he refers are the very ones in issue here.

As a further claim to the propriety of sending out these 9250 cards, the Messrs. Cole argue that there is no rule or yardstick by which to evaluate this practice as improper. They ask why should they be singled out by the committee when a practice such as is here in question is commonplace among other lawyers. In further defense, they cite the commonly accepted practice in the past of some lawyers, including Cole and Cole, in listing their names in various directories in bold type. In this connection, it is noted that this practice, as related to the telephone directory, was considered and acted upon by the Hartford County grievance committee. It was determined that such listings constituted a violation of canon 27, and notice to conform to this determination was sent to all members of the bar. The committee was earlier informed, and the court told, that in the city directory bold-type listings would no longer appear, with issuance of the 1960 publication. For one thing, the directory listings were open and obvious to anyone who cared to or had occasion to use them, and such listings were then a common practice with many members of the bar. Thus, the entire bar and public using the publication would be aware of these listings. As to the greeting cards in question, it is only by mere chance that one of almost ten thousand was turned over to the committee. Had that not happened, neither the committee nor the court would have had an inkling of the existence of this practice. This could have gone on indefinitely, so long as knowledge of it was limited to Cole and Cole and the card recipients, provided no comment was forthcoming from any of the latter. The dis-

closure made by Joe's Amoco Service, under the circumstances, was action taken in the best interests of the public and the bar.

As to the claim of Messrs. Cole that other lawyers mail cards in the manner and form employed by them, there was no evidence of such a practice. The committee indicated that it knew nothing of this, and that if it had known of it, the offending party would have been summoned before it. In passing, and the court finds it difficult to believe the practice may even exist, it hardly need be said that if any lawyer is engaged in the practice of sending greeting cards of the nature of those here involved, he should desist forthwith. The court can see no reason for the mailing of such cards, and especially in the manner described in this case, except as a "go-getting" device such as might be conceived under modern business methods to "drum up business."

The Messrs. Cole directly accuse the committee of having singled them out and treated them in a manner that is "harsh, oppressive and discriminatory." Finally, they charge some ulterior and dark motive for their being notified on March 7, 1960, to appear before this court. In court on March 15, 1960, Cyril Cole asked in part: "What's behind it? . . . . I can't help but feel that the action on Monday, March 7, 1960 was due to an article that appeared in the Sunday Courant concerning me, dated March 6, 1960." In this regard, the facts indicate that one member of the committee left the country on March 2, 1960, for a short vacation, and that prior to that date, the committee had reached a decision to refer the matter to the court under § 51-90.

The preamble to our canons of professional ethics provides in part: "The future of the Republic, to a great extent, depends upon our maintenance of jus-

tice pure and unsullied. It cannot be so maintained unless the conduct and the motives of the members of our [legal] profession are such as to merit the approval of all just men." Canon 27, entitled "Advertising, direct or indirect," provides in part: "It is unprofessional to solicit professional employment by . . . advertisements, through . . . communications . . . not warranted by personal relations." Canon 22, entitled "Candor and fairness," provides in part: "The conduct of the lawyer before the court and with other lawyers should be characterized by candor and fairness. . . . It is unprofessional and dishonorable to deal other than candidly with the facts . . . in the presentation of causes. . . . Neither should [a lawyer] introduce into an argument, addressed to the court, remarks or statements intended to influence . . . bystanders."

While the grievance committee has presented Morton E. Cole and Cyril Cole in violation of canon 27, yet, in view of the hearing had before the court on March 15, 1960, and certain remarks there made by Cyril Cole, the court, on its own, must first comment in regard to canon 22. At the hearing, the courtroom was crowded, containing numerous members of the bar. The three members of the committee were seated at one of the counsel tables. In quoting from the proceedings before the committee on January 11, 1960, Cyril Cole, in instances, lifted out of context what was said there. At least once he was reminded by the court of that. He made reckless and unfounded charges as to the committee's motives in presenting the matter in court, especially as to the claimed "timing" of their notice to appear as related to a certain newspaper article concerning him and his firm. The facts clearly show there was no reason or basis for this, since the committee acted a number of days in advance of the article's appearance. In regard to this canon, his conduct before

the court was neither fair nor candid; it was unprofessional and not becoming to a lawyer of so many years' experience; and some of his remarks were obviously intended to influence bystanders in the courtroom.

As to canon 27, it is quite apparent what the Messrs. Cole had in mind in sending out these cards in the form and manner recited here. For Cyril Cole to tell the court that these cards were intended purely and simply as a warm, human and heartfelt desire to wish those 9250 people the season's greetings, at a time "when all of us feel most kindly towards our fellow man," for him to compare this type of card to a personal greeting card that one, including a lawyer, might send to a friend, simply bearing the sender's name, for him to claim that a prohibition against sending out cards in the manner and form here involved would also mean that he would not be permitted to call back "Merry Christmas" to a similar greeting extended to him by the janitor or elevator man, is audacious indeed. His maturity and sense of judgment ought surely to provoke better reasoning than that. These two lawyers, each given an opportunity to earn a fine living and participate in an honorable profession, have, with years of planning and obvious purpose, indulged in a practice that should at least have caused uneasiness, if not concern, to any lawyer sensitive to his oath and canons of ethics and mindful of his duties and responsibilities as a member of the bar. The profession of law is not a medium in which a lawyer has a right to be a huckster of his wares. The court regrets to say that this is what happened here.

Comment must be made regarding the three members of the grievance committee. These men were chosen by the Superior Court with great care. The reputation, ability and integrity of each one was carefully considered by the judges of that court.

Each was asked to serve in a difficult and many times unpleasant post because he was highly qualified for the responsible position. The court believes the committee, in presenting the Messrs. Cole, was led to adopt this course, in part at least, by a somewhat defiant attitude on the part of both these men. A spirit of understanding on the part of the Coles and an expressed willingness on their part to correct an obviously flagrant practice might well have averted the ultimate court procedure and the attendant publicity. The committee had its duty to perform. Under the circumstances, the committee could hardly have acted other than it did. The court regrets that the members of the committee were subjected to the conduct exhibited by Cyril Cole at the hearing. It was entirely unnecessary and unwarranted. Under the facts presented to the committee, the members may well have pursued other features of the statute by which the outcome to the Messrs. Cole might well have been far more damaging.

Finally, it is not the court's intention to spell out what kind of greeting cards a lawyer may send and to whom. Neither is this court called upon to set forth a yardstick of behavior and conduct, as a guide, in that respect. It merely requires a little common sense, some thought and an honest endeavor to live up to the true standard of a fine profession. A legal career has made available to the lawyer a most satisfying way of life and afforded great opportunity to achieve honor and distinction, as well as to enable him to render real public service. He can preserve the greatness of his profession or he can wreck it. His education and training surely must cause him to be possessed of ample judgment to bring about an honest appraisal of what is the right thing to do under the circumstances.

As to Morton E. Cole and Cyril Cole, the court does hereby reprimand them for conduct clearly un-

becoming to those who are members of the legal profession. Not only should they have known better, but the court is convinced that they did know better, and yet they persisted in a course of conduct which reflects their failure to abide by ethical requirements which they were bound to observe.